Criminal Case Template














COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS





JULIA FERIA,


 Appellant/Cross-Appellee,

v.


THE DYNAGRAPHICS COMPANY,
INC. d/b/a THE DYNAGRAPHICS
GROUP, AND ADOLPHUS
ANDREWS, JR. AND FRANCES A.
DILLINGHAM d/b/a ANDREWS-DILLINGHAM PROPERTIES,


 Appellees/Cross-Appellants.
§


§


§


§


§


§

§



No. 08-00-00078-CV


Appeal from the


160th Judicial District Court


of Dallas County, Texas


(TC# 96-13048-H)



M E M O R A N D U M O P I N I O N



 Julia Feria appeals from the granting of a motion to strike expert testimony and 
summary judgment in favor of Appellees the Dynagraphics Company, Inc. d/b/a the
Dynagraphics Group, and Adolphus Andrews, Jr. and Frances A. Dillingham d/b/a
Andrews-Dillingham Properties. Appellant filed a negligence action claiming that she
suffered personal injuries as the result of being exposed to toxic chemicals released into
the work place by a print shop operated by Dynagraphics Group and located in a facility
next door to her place of work. The office complex is owned and managed by Appellee
Andrews-Dillingham Properties. Appellant raises two issues on appeal: (1) it was error
for the trial court to grant Defendants' Original and Supplemental Motion in Limine and
to Strike Plaintiff's Expert Witnesses and Reports on the grounds that: i) the evidence
presented failed to provide sufficient epidemiological data supporting causation, and (ii)
the evidence presented failed to establish the validity of QEEG and SPECT scans as
diagnostic of neurotoxicity; and (2) the trial court erred in granting summary judgment in
favor of Appellees, the Dynagraphics Company, Inc. d/b/a the Dynagraphics Group, and
Adolphus Andrews, Jr. and Frances A. Dillingham d/b/a Andrews-Dillingham Properties
on the basis of no evidence of causation.

 The Dynagraphics Company, Inc. d/b/a the Dynagraphics Group, and Adolphus
Andrews, Jr. and Frances A. Dillingham d/b/a Andrews-Dillingham Properties as Cross-Appellants filed conditional cross points of error in the event that the trial court's decision
is not affirmed.

 For the reasons stated, we affirm the decision of the trial court and consequently,
do not reach the cross-appeals filed by Appellees as Cross-Appellants. 
I. FACTUAL AND PROCEDURAL HISTORY


 On or about January 1, 1994, Appellant, incidental to her employment, moved into
an office suite located at 5415 Maple Avenue, Suite 310, Dallas, Dallas County, Texas.
Appellee, The Dynagraphics Company ("Dynagraphics"), operated a print shop next to
Appellant's office. Appellee, Adolphus Andrews and Frances A. Dillingham d/b/a
Andrews-Dillingham Properties ("Andrews-Dillingham Properties"), are the owner and
manager of the premises. 

 Appellant worked at the office from January 1994 until January of 1996. During
the course of her employment she suffered headaches, stomach pains, difficulty breathing,
watering eyes, and irritation to her throat, lungs, kidneys and liver. She also suffered
neurological and neuropsychological damage. Believing that her illness and symptoms
were a result of improper ventilation between Dynagraphics's office and her own and
believing that Dynagraphics's employees carelessly handled hazardous toxic chemical
products, she filed suit.

 Dynagraphics and Andrews-Dillingham Properties filed motions in limine and
motions to strike Appellant's expert witnesses and reports. The trial court struck three of
Appellant's medical expert witnesses. Dynagraphics and Andrews-Dillingham Properties
then filed motions for summary judgment. The trial court granted the motions,
specifically finding there was no evidence of causation. This appeal and these cross-appeals follow.

II. DISCUSSION


 On appeal, Appellant presents two issues, Dynagraphics presents four cross-issues,
and Andrews-Dillingham Properties presents seven cross-issues. We first address
Appellant's issues and because of our decision, do not reach the cross-issues asserted by
Appellees.

A. Abuse of Discretion Standard of Review

 In Issue No. One, Appellant asserts that the trial court erred in granting Appellees'
Original and Supplemental Motion in Limine and to Strike her Expert Witnesses and
Reports on the grounds that: (1) the evidence presented failed to provide sufficient
epidemiological data supporting causation, and (2) the evidence presented failed to
establish the validity of QEEG and SPECT scans as diagnostic of neurotoxicity. The
determination of this issue is critical to the disposition of the remaining issue, whether
summary judgment was proper. The Appellees, Dynagraphics and Andrews-Dillingham
Properties objected to Appellant's expert witness by a Motion in Limine and to Strike
Plaintiff's Expert Witnesses filed on November 30, 1998. Defendants filed a
Supplemental Motion in Limine and to Strike Plaintiff's expert Witnesses and Reports on
April 21, 1999. A hearing was held on June 18, 1999. Though not included in the record
on appeal, the Court apparently entered an Order granting Defendants' motions. Plaintiff
filed a Motion to Reconsider the ruling on July 30, 1999. The Court provided a detailed
Order on the Plaintiff's Motion to Reconsider setting out his analysis with regard to the
decision. The court entered an Order granting Defendants' motions on September 23,
1999. Subsequent to the granting of the motion to strike, both Defendants filed motions
for summary judgment which were granted on the basis of no evidence of causation.

 We review a trial court's exclusion of expert testimony for an abuse of discretion. 
See Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 718-19 (Tex. 1998);
Broders v. Heise, 924 S.W.2d 148, 151 (Tex. 1996). A trial court abuses its discretion if
it acts without reference to any guiding rules or principles. E.I. du Pont de Nemours &
Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995). A reviewing court cannot conclude
that a trial court abused its discretion if, in the same circumstances, it would have ruled
differently or if the trial court committed a mere error in judgment. Instead, the test is
whether the trial court acted without reference to any guiding rules or principles; in other
words, whether the act was arbitrary and unreasonable. Id.

B. Expert Witness Qualifications

 Texas Rule of Evidence 702 provides: "If scientific, technical, or other specialized
knowledge will assist the trier of fact to understand the evidence or to determine a fact in
issue, a witness qualified as an expert by knowledge, skill, experience, training, or
education may testify thereto in the form of an opinion or otherwise." Rule 702 contains
three requirements for admission of expert testimony: (1) the witness must be qualified;
(2) the proposed testimony must be scientific, technical, or specialized knowledge; and (3)
the testimony must "assist the trier of fact to understand the evidence or to determine a fact
in issue." Tex. R. Evid. 702; Robinson, 923 S.W.2d at 556. The party offering the expert's
testimony bears the burden to prove that the witness is qualified under Rule 702. See
Gammill, 972 S.W.2d at 718; Broders, 924 S.W.2d at 151. The role of the trial court in
qualifying experts is to ensure "that those who purport to be experts truly have expertise
concerning the actual subject about which they are offering an opinion." Broders, 924
S.W.2d at 152. The offering party must demonstrate that the expert witness possesses
special knowledge as to the very matter on which he proposes to give an opinion. 
Gammill, 972 S.W.2d at 718. In addition, the requirements of reliability and relevance
apply to all expert testimony offered under Rule 702. See Gammill, 972 S.W.2d at 725.

 Appellant argues that the trial court committed error in excluding three of
Plaintiff's medical expert witnesses, Alfred R. Johnson, D.O., Theodore Simon, M.D. and
Jonathan Walker, M.D. We review the court's decision under the abuse of discretion
standard. In his order striking Appellant's experts, the trial court explained that "[t]he
major deficiency with the plaintiff's experts' opinion is the lack of sufficient
epidemiological data supporting causation of neurotoxicity from the specific substances at
issue at the levels of exposure at issue in this action." The court also opined that the
plaintiff had not established the validity of the diagnostic tests relied upon in this case, the
QEEG and SPECT scan tests. As attachments to the various motions and responses filed in
this case, and included in the appellate record are hundreds of pages of publications
relating to neurotoxicity and solvents. The trial court acknowledge receipt of the library of
information and reviewed the evidence provided by the Plaintiffs on at least two
occasions. In a detailed opinion written as a response to Plaintiff's motion to reconsider,
the trial court explained his concerns with the evidence provided by the Plaintiff. As
described previously, the court found fault with the opinions of the Plaintiff's experts in
two areas: first, he believed that the experts did not provide sufficient epidemiological
data to support an opinion that Appellant's symptoms were caused by the fault of the
defendants and, second, he found that the validity of the diagnostic tests relied upon by the
doctor experts had not been established. The underlying qualifications of the doctor
experts was not addressed and does not appear to be a ground for the trial court's decision.

 The appellate record does not contain a written response to Defendants' Motions to
Strike. On June 18, 1999, the trial court held an evidentiary hearing to consider
defendants' motions. The three experts ultimately excluded by the court did not appear to
provide testimony at the hearing to strike. Appellant called Michael Nicar, Ph.D. to
provide testimony on the reliability of her experts' opinions. Appellant provided the court
with several hundred pages of articles regarding the subject of toxicity and elicited
comments from Dr. Nicar regarding several of the articles. Dr. Nicar also provided
testimony regarding medical records of Appellant and the validity of some of the tests
performed on Appellant. He noted that her blood tests revealed the presence of chemicals. 
Dr. Nicar was also asked to discuss the validity of the SPECT test relied upon by Plaintiff
as evidence of her illness. Dr Nicar confirmed that the test is used as a diagnostic tool by
neurologists but clarified that "having an abnormal SPECT scan does not mean you are
exposed to solvents and have neurotoxicity. It means there's something wrong with the
blood flow in your brain." No evidence of the cause of Appellant's neurotoxicity was
presented at the hearing. In response to cross-examination, Dr. Nicar confirmed that there
are other sources for all the chemicals that were found in Appellant's blood other than the
Dynagraphics print shop. Most importantly, no showing of why or how each of the three
expert physicians was qualified or able to testify that the cause of Appellant's illness was
the Dynagraphics print shop is included in the record. No discussion of the details relevant
to a determination of causation occurred. 

 Plaintiff filed a motion for reconsideration of the court's decision which included
several hundred pages of cases addressing the exclusion of expert witnesses, the transcript
of the hearing held on June, 18, 1999 and an article on the subject of neurologic function in
gulf war veterans. Also attached were affidavits from Doctors Nicar, Johnson, and
Walker. (1) Dr. Nicar's affidavit addressed the accreditation of ACCU-CHEM laboratory for
testing human blood and is not relevant to the issue of the striking of the other doctor
experts. The affidavits of doctors Johnson and Walker were tendered as treating physician
expert witnesses. Dr. Johnson's affidavit provided for a diagnosis of toxic encephalopathy (2)
as result of exposure to chemicals. Dr. Walker's affidavit also provided for a diagnosis of
toxic encephalopathy and specifically attributed the diagnosis to exposure to chemicals in
Appellant's work place. Dr. Simon's affidavit provides the court with a lengthy description
of his accomplishments and qualifications which establish his credentials for providing a
diagnosis of Appellant's medical condition of toxic encephalopathy but his affidavit does
not actually state that he has made such a diagnosis. Each affidavit is repleat with boiler
plate self-serving statements which attempt to bolster the affidavit to the realm of credible
evidence. Most importantly, none of the affidavits provide any information to explain why
the physicians are qualified or able to testify that the cause of Appellant's illness was
specific conduct of any defendant. Each affidavit is an example of an experts' opinion
offered as proof because the expert said so. Though each expert's affidavit contains an
impressive array of information establishing their authority as physicians familiar with and
qualified to testify regarding the diagnosis of toxic encephalopathy, the gap in the evidence
presented, is the basis for each physicians' professed opinion that the cause of Appellant's
toxic encephalopathy was the conduct of the defendants. An expert's testimony must be
found to be reliable and probative and the mere fact that an expert is willing to sign an
affidavit that proffers an opinion without more is not sufficient to survive a motion to
strike. See, Viterbo v. Dow Chemical Co., 826 F.2d 420 (5th Cir. 1987). (3)

 C. Application of Standard of Review

 Expert testimony must be based on a reliable foundation of scientific or professional
technique or principle. Robinson, 923 S.W.2d at 557. When the expert's underlying
scientific technique or principle is unreliable, the expert's opinion is no more than
subjective belief or unsupported speculation and is inadmissible. Id. In ensuring that the
testimony rests on a reliable foundation, the trial court is not to determine whether an
expert's conclusions are correct, but only whether the analysis used to reach those
conclusions is reliable considering all the evidence. Gammill, 972 S.W.2d at 728; Marvelli
v. Alston, 100 S.W.3d 460, 475 (Tex. App.--Fort Worth 2003, pet. denied).

 In Robinson, the Texas Supreme Court set forth six factors, now known as the
Daubert/Robinson factors, to aid courts in determining whether scientific testimony is
reliable: (1) the extent to which the theory has been tested; (2) the extent to which the
technique relies on the expert's subjective interpretation; (3) whether the theory has been
subject to peer review and/or publication; (4) the technique's potential rate of error; (5)
whether the underlying theory or technique has been generally accepted as valid by the
relevant scientific community; and (6) the nonjudicial uses that have been made of the
theory or technique. Robinson, 923 S.W.2d at 557; Gammill, 972 S.W.2d at 720-21;
Marvelli, 100 S.W.3d at 475.

 Following Robinson, the Texas Supreme Court addresses the issue of scientific and
nonscientific evidence and determined that while all expert testimony must be reliable
before it may be admitted, the factors affecting reliability as outlined in Robinson are not
applicable to all expert testimony. Gammill, 972 S.W.2d at 726. Instead, where experts
rely on experience and training rather than a particular methodology to reach their
conclusions, Gammill directs us to determine whether there may be "simply too great an
analytical gap between the data and the opinion proffered" for the opinion to be reliable. 
Id.; JCPenney Life Ins. Co. v. Baker, 33 S.W.3d 417, 428 (Tex. App.--Fort Worth 2000, no
pet.).

 Still, in discharging its duty as "gatekeeper," the trial court is in the best position to
decide whether some or all of the Daubert/Robinson factors and/or the Gammill general
reliability test should be applied to determine the reliability of the expert's testimony. 
Gammill, 972 S.W.2d at 726; see Couch v. Simmons, 108 S.W.3d 338, 342-43 (Tex. App.--Amarillo 2003, no pet.) (applying Daubert/Robinson factors and Gammill analytical gap
test); see also Missouri Pacific R. Co. v. Navarro, 90 S.W.3d 747, 758 (Tex. App.--San
Antonio 2002, no pet.) (applying Daubert/Robinson factors and Gammill analytical gap
test).

D. Daubert/Robinson Factors

 Analyzing the evidence in this case in light of the Daubert/Robinson factors, we
conclude that the evidence shows that the diagnosis provided by the experts has not been
supported with sufficiently reliable evidence of causation, and the underlying diagnostic
tests are controversial within the relevant scientific community. The validity of the SPECT
and QEED tests as diagnostic tools to establish the diagnosis was not established by the
Plaintiff. Moreover, the evidence shows that the experts failed to sufficiently rule out other
causes or provide any nexis between the illness claimed by Appellant and the Defendants'
conduct. On appeal, Appellant argues that her experts' causation testimony was reliable
under the Daubert/Robinson factors but she does not provide the link to establish causation
under the totality of the evidence presented. The trial court, therefore, did not abuse its
discretion in determining that the experts' causation testimony was lacking in sufficient
epidemiological data supporting causation of neurotoxicity under the Daubert/Robinson
factors.

E. Gammill's Analytical Gap Test

 In applying Gammill's "analytical gap" test, we must analyze the underlying data
forming the basis for the expert's opinion. Gammill 972 S.W.2d at 726; In re D.S., 19
S.W.3d 525, 529 (Tex. App.-- Fort Worth, 2000 no pet.). "If the foundational data
underlying opinion testimony are unreliable, an expert will not be permitted to base an
opinion on that data because any opinion drawn from that data is likewise unreliable." 
Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 714 (Tex. 1997), cert. denied, 523
U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998). In the present case, the trial court
properly recognized that the experts' experience and training, diagnostic tests of the SPEC
and QEEG scans, and the medical literature that served as the basis for their opinions did
not support evidence of causation and were unreliable as to that fact. As a result, that
finding also rendered their opinions unreliable.

F. Experts' Affidavits


1. Dr. Johnson's Affidavit


 Dr. Johnson's affidavit establishes his qualifications and credentials to practice as a
physician. He testifies that he is qualified to treat patients who have been injured by
exposure to various chemicals. The Affidavit Continues as a series of statements of facts
unsupported by any foundation or evidentiary basis. Dr. Johnson continues by stating that
because of his educational background, professional experience, professional certifications,
professional memberships, honors, publications and lectures he is qualified to render an
opinion on the cause of Plaintiff's injuries. He provides no factual basis or explanation for
his opinions. 

 Dr. Johnson refers to the QEEG and SPECT tests administered to Appellant as well
as blood studies performed on Appellant to establish his qualifications to render a diagnosis
of toxic encephalopathy as a result of exposure to chemicals. Dr. Johnson states that "[t]he
technique that [he] used is an accepted medical technique that has been subjected to peer
review and publication within the medical community." His affidavit continues by stating
that the methodology he relied upon is generally accepted within the medical community
and that he "ruled out all other possible causes of her injuries by utilization of a differential
diagnosis." His affidavit does not, however, provide any basis for the broad conclusory
statements nor does it purport to identify the cause or source of the chemical exposure. 
Assuming Dr. Johnson's affidavit passes scrutiny to provide a basis for a diagnosis in this
case, it does not provide any evidence of causation. 

2. Dr. Walker's Affidavit

 Dr. Walker's affidavit establishes his qualifications as a neurologist who is well
qualified to treat a patient with exposure to organic solvents. He states that the
methodologies that he used in determining the diagnosis of Appellant were sound and
accepted within the medical community. He continues by stating that he used a
differential diagnosis to diagnose Appellant and that he "ruled out all other possible
causes of Appellant's injuries in order to come up with the diagnosis that she suffers
from toxic encephalopathy as a result of being exposed to chemicals in her work place." 

 Dr. Walker references the tests that he relied upon and states that the methods and
procedures are accepted in the scientific community. Dr. Walker states that he reviewed
air test results which showed that "the same chemicals tested in her blood also were
found in her office space." He asserts that "Julia Feria was exposed to chemicals in her
work place by inhalation, that is supported by the air test in her office that I have
reviewed." 


 Dr. Walker's affidavit continues by stating that he is aware of evidence of
Appellant's brain injury and confirms that she is suffering from exposure to chemicals. 

 Like Dr. Johnson's affidavit, Dr. Walker does not provide any evidence of the
cause for the exposure to the chemicals. There is, in fact no evidence that the source or
type of chemicals are related to either Defendant.

 Though Dr. Walker's affidavit says that it is so, the Plaintiff has not shown how
or why Dr. Walker is qualified to testify that the cause of Appellant's illness is
attributable to conduct of the Defendants. 

3. Dr. Simon's Affidavit 

 Dr. Simon's affidavit also provides information about his professional credentials
and qualifications. Dr. Simon provides evidence about the use of the SPECT scan test
in general and as applied to Appellant in particular. His affidavit provides that he is
qualified to testify about the use of the SPECT scan as a diagnostic tool for diagnosing
neurotoxicity. 

 His affidavit is repleat with statements that provide support for his position that
Appellant suffered injuries resulting from exposure to toxic chemicals because he is of
the opinion that such occurred. Again, there is no evidence to establish any causation of
the toxic encephalopathy. His affidavit merely provides that Appellant was injured and
her diagnosis is supported by the methodology that he used to determine that fact. 

4. Medical Literature

 If a medical expert seeks to support his opinion on causation with medical
literature, he must base his opinion on a "broad reading of the medical literature." 
Minnesota Min. & Mfg. Co. v. Atterbury, 978 S.W.2d 183, 193 (Tex. App.--Texarkana
1998, pet. denied). "Broad reading of the medical literature" means that the expert must
"point to specific passages in varied and different sources that are generally accepted as
support for his conclusion." Id. Here, although Appellant asserts that her expert
doctors' opinions were based on information included in dozens of scientific articles
discussing solvent neurotoxicity and she tendered hundreds of pages of reports to the
court, she did not explain how the articles supported the opinions nor did any expert
point to specific passages supporting his opinion.

 In summary, the doctors' experience and training in their respective fields, even
considered with the medical literature, did not form a reliable basis for their opinions as
to the cause of Appellant's toxic encephalopathy. The literature provides general
information about the broad topic of solvent based encephalopathy yet none are helpful
in linking the diagnosis to the Defendants. When the bases for the experts' opinion are
unreliable, their opinions are also unreliable. Havner, 953 S.W.2d at 714. Therefore,
because an analytical gap exists, the trial court did not abuse its discretion by excluding
the experts' testimony as scientifically unreliable. Gammill, 972 S.W.2d at 726. 
Appellant's Issue No. One is overruled.

G. Summary Judgment Standards of Review

 The standard of review on appeal is whether the successful movant at the trial
level carried its burden of showing that there is no genuine issue of material fact and that
a judgment should be granted as a matter of law. Lear Siegler, Inc. v. Perez, 819 S.W.2d
470, 471 (Tex. 1991); Nixon v. Mr. Property Management Co., 690 S.W.2d 546, 548
(Tex. 1985); Cortez v. Liberty Mut. Fire Ins. Co., 885 S.W.2d 466, 469 (Tex. App--El
Paso 1994, writ denied). Thus, the question on appeal is not whether the summary
judgment proof raises fact issues as to required elements of the movant's cause or claim,
but whether the summary judgment proof establishes, as a matter of law, that there is no
genuine issue of material fact as to one or more elements of the movant's cause or claim. 
Gibbs v. General Motors Corp., 450 S.W.2d 827, 828 (Tex. 1970).

 In resolving the issue of whether the movant has carried this burden, all evidence
favorable to the non-movant must be taken as true and all reasonable inferences,
including any doubts, must be resolved in the non-movant's favor. Nixon, 690 S.W.2d at
548-49; DeLuna v. Guynes Printing Co., 884 S.W.2d 206, 208 (Tex. App.--El Paso
1994, writ denied). Where the defendants are the movants and they submit summary
evidence disproving at least one essential element of each of plaintiff's causes of action,
then summary judgment should be granted. See Perez, 819 S.W.2d at 471; Bradley v.
Quality Serv. Tank Lines, 659 S.W.2d 33, 34 (Tex. 1983); Cortez, 885 S.W.2d at 469. 
Furthermore, when a trial court's order granting summary judgment does not specify the
ground or grounds relied on for the ruling, summary judgment will be affirmed on appeal
if any of the theories advanced are meritorious. State Farm Fire & Cas. Co. v. S.S., 858
S.W.2d 374, 380 (Tex. 1993); Rogers v. Ricane Enter. Inc., 772 S.W.2d 76, 79 (Tex.
1989). 

 Under the "no-evidence summary judgment" rule, the movant may move for
summary judgment if, after adequate time for discovery, there is no evidence of one or
more essential elements of a claim or defense on which the nonmovant would have the
burden of proof at trial. Tex. R. Civ. P. 166a(i). The motion must state the elements as
to which there is no evidence. Id. The reviewing court must grant the motion unless the
nonmovant produces summary judgment evidence raising a genuine issue of material
fact. Id. Under the no evidence summary judgment standard, the party with the burden
of proof at trial will have the same burden of proof in a summary judgment proceeding. 
See, e.g., Esco Oil & Gas, Inc. v. Sooner Pipe & Supply Corp., 962 S.W.2d 193, 197 n.3
(Tex. App.--Houston [1st Dist.] 1998, pet. denied) (commenting that under Rule 166a(i)
"the plaintiff as the nonmovant [has] the burden to raise a triable issue on each element
essential to the plaintiff's case against each defendant.").

 "'A no-evidence summary judgment is essentially a pretrial directed verdict,' and
we apply the same legal sufficiency standard in reviewing a no-evidence summary
judgment as we apply in reviewing a directed verdict." Moore v. K Mart Corp., 981
S.W.2d 266, 269 (Tex. App.--San Antonio 1998, pet. denied); see also Hon. David
Hittner & Lynne Liberato, Summary Judgments in Texas, 34 Hous. L. Rev. 1303, 1356
(1998) (no evidence summary judgment is essentially pretrial directed verdict). 

 A no-evidence summary judgment is properly granted if the nonmovant fails to
bring forth more than a scintilla of probative evidence to raise a genuine issue of material
fact as to an essential element of the nonmovant's claim on which the nonmovant would
have the burden of proof at trial. See Tex. R. Civ. P. 166a(i); Merrell Dow
Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997), cert. denied, 523
U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998). If the evidence supporting a finding
rises to a level that would enable reasonable, fair-minded persons to differ in their
conclusions, then more than a scintilla of evidence exists. Havner, 953 S.W.2d at 711. 
Less than a scintilla of evidence exists when the evidence is "so weak as to do no more
than create a mere surmise or suspicion" of a fact, and the legal effect is that there is no
evidence. Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983). 

 In Issue No. Two, Appellant argues that the trial court erred in granting
Dynagraphics's Second Motion for Summary Judgment and Andrews-Dillingham
Properties's No Evidence Motion for Summary Judgment on the basis of no evidence of
causation. Because we find that the court did not abuse his discretion in excluding the
expert witnesses tendered by Appellant, there was no evidence of causation presented to
the court to defeat the defendants' motions for summary judgment. 


 Because Appellant presented no causation evidence other than that of Drs.
Johnson, Walker and Simon, and the trial court ruled their testimony was not reliable, an
essential element of Appellant's claim is not supported by evidence. Marvelli, 100
S.W.3d at 475. Accordingly, we find that the take-nothing judgment rendered by the trial
court against Appellant was appropriate. Appellant's Issue No. Two is overruled in its 

entirety. Because both of Appellant's issues have been overruled, we find we need not 

address issues raised by Cross-Appellants. We affirm the judgment of the trial court.

March 15, 2004



 RICHARD BARAJAS, Chief Justice


Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.


1. Though not attached to the motion to reconsider, Dr. Theodore Simon's affidavit appears to have been
filed with the trial court on June 15, 1999 and is included in the Appellate record. 
2. The National Toxic Encephalopathy Foundation describes the diagnosis as being "known in layman terms
as Toxicant Induced Loss of Tolerance (TILT), Multiple Chemical Sensitivity (MCS) or Environmental Illness (EI)." 
National Toxic Encephalopathy Foundation. Feb 26, 2004, <http://ntef-mcs.freeyellow.com/ >. 
3. The court in Viterbo found Dr. Alfred Johnson's testimony not admissible and characterized Dr. Johnson's
testimony as " no more than Viterbo's testimony dressed up and sanctified as the opinion of an expert. Without
more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." Viterbo, 826
F.2d at 424. 

 Dr. Johnson is a doctor of Osteopathy licensed to practice in Texas, Oklahoma, Missouri, Illinois, and
Florida. Dr. Johnson's testimony has been excluded in numerous cases throughout the country. The majority of the
cases involved testimony related to a diagnosis of multiple chemical sensitivity but often focus on the reasoning and
methodology underlying the testimony to determine whether it is scientifically valid. The critical determination to
be made by the trial court is whether the proffer of scientific evidence will assist the trier of fact to determine a fact
in issue. The court is perceived as a "gatekeeper" who must insure that scientific controversies are settled by the
methods of science rather than the methods of litigation. See, eg, Viterbo v. Dow Chemical Co., 826 F.2d 420, 56
USLW 2220, 23 Fed. R. Evid. Serv. 1222, (5th Cir. 1987).