Affirmed and Opinion filed August 26, 2008








Affirmed and Opinion filed August 26, 2008.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00905-CV

____________

 

TRANSCONTINENTAL INSURANCE COMPANY, Appellant

 

V.

 

JOYCE CRUMP, Appellee

 



 

On Appeal from the 400th
District Court

Fort Bend County, Texas

Trial Court Cause No. 02-CV-125132

 



 

O P I N I O N

In this worker=s compensation
death benefits judicial review proceeding, appellant, Transcontinental
Insurance Company, appeals a judgment in favor of appellee, Joyce Crump. 
Finding no error, we affirm the trial court=s judgment.

Factual and Procedural Background








Appellee was married to Charles Crump, a longtime employee
of Frito Lay. Mr. Crump worked in the packaging department at Frito Lay and on
May 9, 2000, while training another employee, he struck his right knee on a
tape dispensing machine.  Because his knee injury occurred at work, Mr. Crump
sought, and received, workers= compensation benefits from appellant. 
Beginning with his workplace knee injury, Mr. Crump=s physical
condition began a downward spiral until he died on January 23, 2001, only eight
months after the injury.  The overarching dispute in this appeal is whether Mr.
Crump=s May 9, 2000 knee
injury was a producing cause of his death.

A.      Mr. Crump=s Medical History
Prior to May 9, 2000

Mr. Crump received a kidney transplant in 1975.  To help
prevent his body from rejecting the transplanted kidney, Mr. Crump was
prescribed immunosuppressant drugs. While these drugs helped his body to not
reject his transplanted kidney, they also made it less likely he would be able
to resist an infection if it should occur.  In addition, in 1978, Mr. Crump
contracted meningitis, and in 1994, Mr. Crump had his gallbladder removed. 
Despite these medical issues, appellee testified that before Mr. Crump=s May 9, 2000 work
injury, he was healthy, active, had no problems, and, with the exception of his
gallbladder surgery, rarely missed a day from work.  Appellee also testified
neither she nor her husband were aware he had hepatitis C or any liver or
kidney problems.  Both medical doctor expert witnesses who testified also
confirmed Mr. Crump=s medical records did not reveal, besides
his transplanted kidney and immunosuppressant therapy, any medical issues
immediately prior to the May 9, 2000 workplace injury.

B.      Mr. Crump=s Medical History
From May 9, 2000 Until His Death








After striking his right knee on the tape machine, Mr.
Crump came home and was in some pain.  According to appellee, Mr. Crump
complained his leg was bothering him and he laid around more than normal. 
Because his leg continued to bother him and he was running a fever, Mr. Crump
went to Dr. Khalid Chaudhary about his leg injury on May 15, 2000.  Dr.
Chaudhary diagnosed a contusion to the right knee and a large hematoma[1]
on the inside area of the knee and lower thigh.  Dr. Chaudhary prescribed
analgesics and antibiotics.  With this initial visit to Dr. Chaudhary, Mr.
Crump began an eight month medical odyssey that included at least eighty days
in three different hospitals, continuous treatment with antibiotics, and
finally ended with his death on January 23, 2001.

Mr. Crump saw Dr. Chaudhary three more times because his
knee injury would not resolve.  On June 6, 2000, because Mr. Crump was
complaining of fever and burning pain in his right leg, Dr. Chaudhary,
concerned a secondary infection had developed in the contused area of Mr. Crump=s right leg,
referred him to Dr. Camille George, an orthodpedic doctor.

Mr. Crump saw Dr. George the next day.  Mr. Crump
complained of increased pain, swelling, fever, and warmth in his right leg and
ankle.  Upon examining Mr. Crump, Dr. George noted extensive swelling and
warmth along his inner thigh, calf, and ankle.  Her impression was Mr. Crump
had cellulitis[2]
of the right thigh, the same area where the May 9th injury occurred.  After
conservative treatment failed, on June 14, 2000, Dr. George recommended
immediate hospitalization for the administration of intravenous antibiotics and
blood cultures.








Mr. Crump was admitted to Polly Ryon Hospital on June 14,
2000, where he remained until he was transferred to Memorial Southwest Hospital
on June 23, 2000, for additional investigation.  At the time he was transferred
to Memorial Southwest, the doctors diagnosed Mr. Crump with cellulitis of both
legs, hepatitis C,[3]
a history of kidney transplant, renal insufficiency, and hemochromatosis.[4] 
Mr. Crump was hospitalized at Memorial Southwest from June 23 until June 26,
2000.  At Memorial Southwest, the doctors thought Mr. Crump had a broad,
opportunistic infection.  According to Dr. John Daller, a transplant surgeon
and one of Mr. Crump=s many treating physicians, opportunistic
infections tend to develop in people who are immunosuppressed.  Organisms such
as bacteria, fungi, or viruses that a normal person would not have a problem
with, can make an immunosuppressed person very sick.  Dr. Daller also explained
the fact a person, such as Mr. Crump, is on immunosuppression therapy can delay
the proper diagnosis of an infection.  According to Dr. Daller, because a
person=s immune system is
suppressed, the person=s body does not react the way a normal
person=s would and it
does not immediately produce pus in the infected area.  Thus, the
immunosuppression drugs can mask not only the existence of an infection, but
also the severity of the infection.  








On June 26, 2000, Mr. Crump was transferred to the
University of Texas Medical Branch,  Galveston (AUTMB@) where Dr. Daller
had agreed to treat him.  At the time he was transferred, the physicians at
Memorial Southwest believed Mr. Crump had sepsis or a body-wide infection with
persistent fever.  The Memorial Southwest doctors believed the source of the
sepsis was Mr. Crump=s lungs.  On July 3rd, a blood culture
showed Mr. Crump had a yeast infection, a type of fungal infection.  So, in
addition to the cellulitis in his right leg, Mr. Crump was now suffering from a
yeast infection in his blood.  According to Dr. Daller, with an
immunosuppressed patient, the effort is to keep the patient balanced between
sufficient immunosuppression to avoid rejection of the transplanted organ and,
at the same time, avoid infection.  When the immunosuppressed patient becomes
infected, the balance is tipped and it can lead to worsening organ function. 
To deal with the yeast infection, Dr. Daller prescribed amphotericin B
infusions.[5] 
Dr. Daller also testified that, other than the immunosuppression drug therapy,
he was not aware of any ongoing health problems Mr. Crump might have been
experiencing prior to this May 9th knee injury.  When UTMB discharged Mr. Crump
on July 13, 2000, he still had cellulitis of his lower right leg, an infection
of the blood from yeast, and there was concern the leg infection might include
the yeast infection.  Also, because of his critical illness (he had spent time
in the intensive care unit at UTMB), Mr. Crump suffered a period of renal
failure and his liver function had deteriorated because of his infection.

Following his discharge on July 13th, Mr. Crump went back
to UTMB from July 22 through July 25, 2000, for angina-like chest pain and
again from July 28 until August 4, 2000.  During the late July hospitalization,
Dr. Steve Weinman, a gastroenterologist, examined Mr. Crump.  According to Dr.
Weinman, Mr. Crump appeared to be a case of decompensation of HCV-associated
cirrhosis of the liver[6]
which was triggered by his recent bout of sepsis/fungemia.  According to Dr.
Daller, Mr. Crump had chronic liver disease but was functioning well with it
before the May 9th knee injury.  But, once Mr. Crump injured his knee and
developed the infection in his leg, this caused a decompensation, or worsening,
of his liver disease.








On September 16, 2000, UTMB admitted Mr. Crump because of
swelling in his right lower leg.  He would not be discharged until October 3,
2000.  During this hospitalization, Dr. Daller determined Mr. Crump had
developed an abscess in the area of the May 9th injury.  On September 26, 2000,
Dr. Daller took Mr. Crump to the operating room where he made an incision and
drained purulent material and obtained blood cultures.  Because of concern over
the possible existence of infection in the wound, Dr. Daller left the wound
open to heal from the inside out.  This wound had still not healed when Mr.
Crump died nearly four months later.  The blood cultures taken from Mr. Crump=s thigh grew out as
histoplasmosis.  Histoplasmosis is an airborne fungus endemic to certain areas,
including large portions of Texas.  A person is normally exposed to the fungus
by breathing it, and the fungus then colonizes the lungs and becomes resident
flora.  Most people exposed to histoplasmosis never develop an infection or any
other symptoms; however, people with suppressed immune systems, such as Mr.
Crump, are more likely to develop an infection once exposed.  Even in people
who are immune suppressed, once exposed, they can go years without an infection
developing because, according to Dr. Daller, histoplasmosis usually requires a
triggering event for an infection to develop.  Dr. Daller opined Mr. Crump=s May 9th knee
injury served as that triggering event.  Also, it is possible for the
histoplasmosis infection to spread through the body either through the blood or
the lymphatic system.  Finally, cellulitis can be a side effect of a blood
borne infection.

Mr. Crump entered UTMB again between October 13 and October
20, 2000, because of persistent fever and sinus pain.  He also went to the
Polly Ryon Hospital Emergency Room on October 22, 2000, with a nose bleed. 
UTMB admitted Mr. Crump again from November 6 until November 18, 2000, because
he was experiencing seizures.  When UTMB discharged Mr. Crump, his infection
had still not resolved as he was taking amphotericin B, an anti-fungal agent,
and vancomycin, an antibiotic.  The doctors also instructed Mr. Crump to
continue changing the dressing on the debridement procedure wound in his leg. 
Mr. Crump visited a UTMB clinic on January 10, 2001 complaining of back pain.








On January 22, 2001, appellee took Mr. Crump to the Polly
Ryon Hospital emergency room.  Mr. Crump went to the emergency room with
complaints of pain in his right lower back and vomiting.  It was also noted Mr.
Crump had been running a high fever and was disoriented for several days before
coming to the hospital.  One of the doctors treating Mr. Crump noted he had
been sick since May 2000 with an infection in his right leg.  The Polly Ryon
medical records also indicate Mr. Crump was experiencing very low blood
pressure.  While still in the emergency room, Mr. Crump vomited several times
and had to be resuscitated.  Mr. Crump was transferred to the Intensive Care
Unit where he died on January 23, 2001.  Mr. Crump was 43 at the time of his
death.

Following Mr. Crump=s death, the
Harris County Medical Examiner performed an autopsy and found that propoxyphene[7]
toxicity was the cause of death.  According to Dr. Daller, propoxyphene
toxicity can be caused in two ways: (1) an overdose, or (2) the failure of the
patient=s liver to
properly metabolize the drug allowing it to build up in the body over time. 
The medical examiner also made the following pathological findings: (1)
propoxyphene toxicity, (2) atherosclerotic cardiovascular disease, (3) chronic
renal failure with intact renal transplant and atrophic native kidneys, and (4)
liver fibrosis with ascites and hyposplenia.  The death certificate lists the
cause of death as cardiorespiratory arrest with cirrhosis and ileus.[8]

C.      The
Administrative and Trial Proceedings            








Contending Mr. Crump=s May 9th injury
was a producing cause of his death, appellee sought workers= compensation
death benefits.  On July 11, 2002, the Appeals Panel of the Texas Workers= Compensation Commission
(now the Division of Workers= Compensation of the Texas Department of
Insurance) affirmed a contested case hearing officer=s decision that
Mr. Crump=s May 9, 2000 work-related injury was a producing
cause of his death.  Appellant then sought judicial review of the Appeals Panel
decision pursuant to chapter 410 of the Texas Labor Code.  The party seeking
judicial review of the workers= compensation Appeals Panel decision has
the burden of proof by a preponderance of the evidence.  Tex. Lab. Code Ann. ' 410.303 (Vernon
2006).  Thus, in seeking judicial review of the Appeals Panel decision,
appellant had the burden to prove, by a preponderance of the evidence, that Mr.
Crump=s May 9, 2000
workplace injury was not a producing cause of his injury.

Prior to trial, appellant sought to exclude the testimony
of appellee=s medical experts, Dr. Daller.  Dr. Daller is a
transplant surgeon who treated Mr. Crump during his hospitalizations at UTMB. 
Appellant argued Dr. Daller=s opinion regarding the role Mr. Crump=s May 9, 2000 knee
injury played in his death was not based on a reliable foundation and should be
excluded.  The trial court denied appellant=s motion.

In addition to appellee, two medical experts testified
during the trial: Dr. Daller and Dr. Jason Hunt, appellant=s retained medical
expert.   Dr. Daller, in addition to testifying on the contents and meaning of
Mr. Crump=s medical records, testified Mr. Crump=s work injury was
a producing cause of his death because it incited or triggered a series of
events that led to his death.  In Dr. Daller=s opinion, Mr.
Crump=s knee injury
provided the site for the development of an infection, the existence of which
was confirmed by blood cultures taken from the injured area, which he was
unable to defeat because of the long term effects of his immunosuppressant drug
therapy necessitated by his kidney transplant.  Dr. Daller further opined this
infection negatively impacted the functioning of his organs, including his
liver and kidney, which ultimately caused his death.








On direct examination, Dr. Hunt opined Mr. Crump=s May 9, 2000 knee
injury was not a producing cause of his death.  In Dr. Hunt=s opinion, Mr.
Crump=s death was caused
by the effects of his chronic health issues including his kidney transplant,
hepatitis C, and diabetes.  According to Dr. Hunt, Mr. Crump would have died on
January 23, 2001, even if he had not injured his knee on May 9, 2000.  In forming
his opinion, Dr. Hunt relied on (1) the lack of objective medical evidence
proving Mr. Crump had a bacterial infection; (2) the autopsy report does not
mention cellulitis, histoplasmosis, or the knee injury as a producing cause of
the death; (3) the accepted method by which histoplasmosis enters the body is
through the lungs and not an injury such as Mr. Crump=s knee injury; (4)
the fact  the four pathological findings listed in the autopsy (propoxyphene
toxicity, artherosclerotic cardiovascular disease, chronic renal failure, and
liver fibrosis with ascites) are problems or diseases that normally require
significant time to negatively impact organ function; (5) his opinion the knee
injury would not have directly resulted in the toxic levels of propoxyphene
found in Mr. Crump=s body during the autopsy; and (6) the
death certificate did not include a notation that Mr. Crump=s death was the
result of a work-related injury. 








Following his direct testimony, Dr. Hunt was extensively
cross-examined by appellee.  During this cross-examination, Dr. Hunt refused to
disavow his deposition testimony in which he stated the hematoma and contusion
on Mr. Crump=s leg may have provided a place for the infection to
develop and it was possible the wound site was infected.  Dr. Hunt also
admitted: (1) there was nothing in the medical records to indicate Mr. Crump
was experiencing symptoms associated with hepatitis C, or liver dysfunction,
prior to his knee injury; (2) his original opinion was that Mr. Crump died as a
result of a heart attack or arrhythmia, but he could not tell if there was any
evidence in the autopsy report supporting his original opinion; (3) he could
not prove Mr. Crump had a bacterial infection but he also could not prove he
did not; (4) Mr. Crump received antibiotic therapy from shortly after his knee
injury until his death; (5) Mr. Crump=s doctors acted
correctly when they treated him for infections even if they could not prove
through objective testing that he had a bacterial infection; (6) he never said
Mr. Crump=s wound was never infected, only that he cannot tell
if it was infected; (7) there can be more than one contributing factor to a
death; (8) the autopsy report noted Mr. Crump=s leg wound was
still open and emitting a strong odor; (9) Mr. Crump=s knee injury
never completely healed before his death; (10) a person can have hepatitis C,
liver disease, and kidney problems and not be aware of those issues; (11) the
histoplasmosis in Mr. Crump=s body was lying dormant prior to his knee
injury; (12) a bruise can become infected and the medical records indicate Mr.
Crump=s doctors
suspected the bruise was infected within ten days, the normal time for an
infection to develop; and (13) Mr. Crump=s wound was a
contributing factor to his death.

Finally, both appellant and appellee addressed an error on
Dr. Hunt=s November 12,
2001 report.  In his report, beneath his signature, Dr. Hunt stated he was a
board certified transplant surgeon.  Dr. Hunt admitted he was not a transplant
surgeon.  He also admitted he wrote the report and proofread it.  Finally, Dr.
Hunt testified he did not know how the assertion made it onto his report.

The case was submitted to the jury with a single issue.[9] 
The jury determined Mr. Crump=s May 9, 2000 knee injury was a producing
cause of his death.  Appellee did not submit the issue of her attorney=s fees to the jury
and instead, over the objection of appellant, submitted the recovery of
attorney=s fees to the
trial court.  The trial court awarded appellee $160,005.23 for  attorney=s fees and
expenses incurred through the completion of the trial.  The trial court also
awarded appellee $2,812.50 for attorney=s fees incurred in
the preparation for and participation in the hearing on the recovery of
attorney=s fees.  This
appeal followed.








Discussion

Appellant raises seven issues on appeal which can be
divided into three general categories.  Issues one and three address the
sufficiency of the evidence.  In issue two, appellant contends the trial court
improperly instructed the jury on producing cause.  In issues four through
seven, asserting various arguments, appellant challenges the trial court=s award of
attorney=s fees to
appellee.  We address each category in turn.

I.        Was Dr.
Daller=s Opinion Reliable?

In its first issue, appellant argues the evidence is
legally and factually insufficient to support the jury=s verdict. 
However, appellant=s sufficiency challenge is based on the
premise Dr. Daller=s testimony constitutes no evidence
because it was not based on a reliable foundation and was inadmissible, thus
making Dr. Hunt=s testimony uncontroverted.  Therefore,
before addressing appellant=s first issue, we examine the third issue
challenging the reliability of Dr. Daller=s expert
testimony.

A.      The
Standard of Review

While evidentiary rulings, including rulings on expert
testimony, are normally reviewed for an abuse of discretion, when the trial
court admits expert testimony and an appellant challenges the expert testimony
as no evidence, we consider whether the expert testimony is reliable under a de
novo standard of review.  Exxon Corp. v. Makofski, 116 S.W.3d 176,
182 (Tex. App.CHouston [14th Dist.] 2003, pet. denied); Mo. Pac.
R. R. Co. v. Navarro, 90 S.W.3d 747, 750 (Tex. App.CSan Antonio 2002,
no pet.).

B.      Dr. Daller=s Causation
Opinion Was Based on a Reliable Foundation








Appellant argues Dr. Daller=s expert testimony
connecting Mr. Crump=s May 9, 2000 knee injury to his death in
January 2001 constitutes no evidence because it was not based on a reliable
foundation.  To evaluate the reliability of Dr. Daller=s causation
opinion, appellant asserts we must apply the six factors first adopted by the
Texas Supreme Court in E. I. du Pont de Nemours & Co. v. Robinson,
923 S.W.2d 549, 557 (Tex. 1995).[10] 
We disagree.[11]

Instead of applying the six Robinson factors, in
this case, where Dr. Daller=s opinion was based on his experience and training
in his field, we consider whether there is an Aanalytical gap@ between the
expert=s opinion and the
bases on which the opinion was founded.  Taylor v. Am. Fabritech, Inc.
132 S.W.3d 613, 619 (Tex. App.CHouston [14th Dist.] 2004, pet. denied)
(citing Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 727
(Tex. 1998)).








Dr. Daller utilized a differential diagnosis in reaching
his conclusions regarding the connection between Mr. Crump=s knee injury and
his death.  A differential diagnosis is a clinical process whereby a doctor
determines which of several potential diseases or injuries is causing the
patient=s symptoms by
ruling out possible causes.  Coastal Tankships, U.S.A., Inc. v. Anderson,
87 S.W.3d 691, 604 (Tex. App.CHouston [1st Dist.] 2002, pet. denied).  
In a differential diagnosis, a doctor compares a patient=s symptoms to
symptoms associated with known diseases, conducts physical examinations of the
patient, collects data on the patient=s history and
illness, and then analyzes that data until reaching a final diagnosis and makes
a decision on how to properly treat the patient=s injury or
illness.  Id.  Differential diagnosis is the basic method of internal
medicine and enjoys widespread acceptance in the medical community.  Id. 
When properly conducted, the technique has important, non-judicial  uses and is
generally accepted as valid by the medical community and has been subjected to
use, peer review, and testing.  Id.  Even with all of the advances of
medical science, the practice of medicine remains an art.  Id.  A
properly conducted and explained differential diagnosis is not Ajunk science.@  Id. 
Medical doctors routinely use differential diagnosis as a sufficient basis on
which to prescribe medical treatment with potential life-or-death
consequences.  Id.  Even Dr. Hunt agreed Mr. Crump=s treating
physicians, including Dr. Daller, acted correctly when they used a differential
diagnosis to treat Mr. Crump and that he would have handled Mr. Crump=s care the same
way.  In Coastal Tankships, the First Court of Appeals determined a
causation opinion by a treating physician developed using a differential
diagnosis was based on a reliable foundation and was therefore admissible.  Id. 
We agree with the First Court of Appeals and hold Dr. Daller=s causation
opinion, developed through a differential diagnosis while treating Mr. Crump,
does not contain an Aanalytical gap@ between his
opinion and the bases on which his opinion was founded.  Therefore, we hold Dr.
Daller=s opinion was
based on a reliable foundation and was properly admitted into evidence.  We
overrule appellant=s third issue.

II.       Was the
Evidence Legally and Factually Sufficient?

In appellant=s first issue,
appellant contends (1) Dr. Daller=s opinion was not
based on a reliable foundation and therefore legally constitutes no evidence;
(2) making Dr. Hunt=s opinion testimony uncontroverted; (3)
which makes the evidence legally and factually insufficient to support the jury=s verdict.

 

 








A.      The
Standard of Review

In this judicial review proceeding, appellant, as the party
appealing from the workers= compensation Appeals Panel decision, had
the burden of proof to establish that Mr. Crump=s May 9, 2000 knee
injury was not a producing cause of his death.  Tex. Lab. Code Ann. ' 410.303.








In a legal sufficiency review, we view the evidence in the
light most favorable to the verdict and indulge every reasonable inference that
supports the verdict.  City of Keller v. Wilson, 168 S.W.3d 802, 822
(Tex. 2005).  We must credit evidence that supports the judgment if reasonable
jurors could and disregard contrary evidence unless reasonable jurors could
not.  See id. at 807, 827.  If the evidence falls within the zone of
reasonable disagreement, we cannot substitute our judgment for that of the fact
finder.  Id. at 822.  Unless there is no favorable evidence, or if the
contrary evidence renders supporting evidence incompetent or conclusively
establishes the opposite, we must affirm.  See id. at 810B11.  AThe final test for
legal sufficiency must always be whether the evidence at trial would enable
reasonable and fair-minded people to reach the verdict under review.@  Id. at
827.  When, as in this case, an appellant attacks the legal sufficiency of an
adverse finding on an issue for which it had the burden of proof, it must
demonstrate on appeal that the evidence establishes, as a matter of law, all
vital facts in support of the issue.  Dow Chem. Co. v. Francis, 46
S.W.3d 237, 241 (Tex. 2001).  In reviewing a Amatter of law@ challenge, the
reviewing court must first examine the record for evidence that supports the
finding, while ignoring all evidence to the contrary.  Id.  If there is
no evidence to support the finding, only then will the reviewing court examine
the entire record to determine if the contrary proposition is established as a
matter of law.  Id.  The issue should be sustained only if the contrary
position is conclusively established.  Id.  Evidence is conclusive only
if reasonable people could not differ in their conclusions.  City of Keller,
168 S.W.3d at 816.  Evidence is no more than a scintilla when it is so weak as
to do no more than create a mere surmise or suspicion of its existence.  Ford
Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004).  The fact finder is
the sole judge of the credibility of the witnesses and the weight to be given
to their testimony.  City of Keller, 168 S.W.3d at 819.

In a factual sufficiency review, we consider and weigh all
the evidence supporting and contradicting the finding.  Plas-Tex, Inc. v.
U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989).  When a party attacks
the factual sufficiency of an adverse finding on which it had the burden of
proof, it must demonstrate on appeal that the adverse finding is against the
great weight and preponderance of the evidence.  Francis, 46 S.W.3d at
242.  We will set aside the finding only if it so contrary to the overwhelming
weight of the evidence as to be clearly wrong and unjust.  Id.  The
amount of evidence necessary to affirm a judgment is far less than the amount
necessary to reverse a judgment.  GTE Mobilnet of S. Tex. v. Pascouet,
61 S.W.3d 599, 616 (Tex. App.CHouston [14th Dist.] 2001, pet. denied).  We
are not a fact finder.  Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402,
407 (Tex. 1998).  Accordingly, we may not pass upon the witnesses= credibility or
substitute our judgment for that of the jury, even if the evidence would
support a different result.  Id.  If we determine the evidence is
factually insufficient, we must detail the evidence relevant to the issue and
state in what regard the contrary evidence greatly outweighs the evidence in
support of the verdict; we need not do so when affirming a jury=s verdict.  Gonzalez
v. McAllen Med. Ctr., Inc., 195 S.W.3d 680, 681 (Tex. 2006) (per curiam).

B.      The
Evidence is Legally and Factually Sufficient

The entire foundation of both appellant=s legal and
factual sufficiency arguments rests upon the contention Dr. Daller=s expert testimony
was not reliable, was inadmissible, and therefore constitutes no evidence. 
However, we have already determined Dr. Daller=s expert opinion
was reliable and was properly admitted by the trial court.  Therefore, it must
be considered in our sufficiency review.








Since appellant had the burden of proof at trial, in our
legal sufficiency review, we first examine the record for evidence that
supports the finding, while ignoring all evidence to the contrary.  Francis,
46 S.W.3d at 241.  We need look no farther than Dr. Daller=s testimony, detailed
above, explaining how Mr. Crump=s May 9, 2000 knee injury contributed to
his death.  This constitutes some evidence supporting the jury=s finding.  We
hold the evidence is legally sufficient.  For the same reason, we determine the
jury=s finding is not
against the great weight and preponderance of the evidence.  Accordingly, the
evidence is factually sufficient.  We overrule appellant=s first issue.

III.      Did the
Trial Court Improperly Instruct the Jury on Producing Cause?

In its second issue, appellant contends the trial court
improperly defined Aproducing cause@[12] in the jury
charge.  We disagree.

A.      The
Standard of Review








A trial court must submit Asuch instructions
and definitions as shall be proper to enable the jury to render a verdict.@  Tex. R. Civ. P. 277.  A proper jury instruction is one
that assists the jury and is legally correct.  Town of Flower Mound v.
Teague, 111 S.W.3d 742, 759 (Tex. App.CFort Worth 2003,
pet. denied).  While this court normally reviews the trial court=s decisions as to
how to charge the jury under an abuse of discretion standard, once the trial
court has decided to define a term in the charge for the jury, this court
determines whether the definition misstates the law using a de novo
standard of review.  St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 525 (Tex.
2003).  So long as the charge is legally correct, a trial judge is accorded
broad discretion regarding the submission of questions, definitions, and
instructions to the jury.  Hyundai Motor Co. v. Rodriguez, 995 S.W.2d
661, 664 (Tex. 1999).  Therefore, we will review the trial court=s legally correct
definitions, instructions, and questions for an abuse of discretion.  Tex.
Workers= Comp. Ins. Fund v, Mandlbauer, 34 S.W.3d 909,
912 (Tex. 2000).  We may not reverse a judgment for error in the submission of
jury instructions, definitions, or questions unless we conclude the error
probably caused the rendition of an improper judgment.  Kiefer v. Cont=l Airlines, Inc., 10 S.W.3d 34, 37
(Tex. App.CHouston [14th Dist.] 1999, pet. denied).  To determine
whether an improper jury charge constitutes reversible error, we consider the
pleadings, the evidence, and the charge in its entirety.  Id.

B.      The Trial Court Properly Defined AProducing Cause@








Courts liberally construe workers= compensation
legislation to carry out its purpose of compensating injured workers and their
dependents.  Albertson=s, Inc. v. Sinclair, 984 S.W.2d 958,
961 (Tex. 1999).  Because of this liberal interpretation, a workplace accident 
or disease is considered to be a producing cause even if it is not a
substantial factor in bringing about the injury, disability, or illness.  Flores
v. Employees Ret. Sys. of Tex., 74 S.W.3d 532, 549 (Tex. App.CAustin 2002, pet.
denied).  Therefore, a workplace injury need not be the sole or primary cause
in bringing about the disability or illness; rather, as long as the
occupational injury is a producing cause of the disability or illness, there is
a sufficient causal link under the workers= compensation
scheme.  Id.  An unrelated condition or injury may even be the primary
factor in causing an employee=s disability or death and still not
preclude a recovery of workers= compensation benefits.  Id.  In
addition, a pre-existing condition will not preclude compensation under the
system as long as a workplace accident contributed to the injury in some
amount.  INA of Tex. v. Howeth, 755 S.W.2d 534, 536B37 (Tex. App.CHouston [1st
Dist.] 1988, no writ).  It is settled law in Texas that in a workers= compensation
case, there may be more than one producing cause of an injury, incapacity, or death. 
Marts v. Transp. Ins. Co., 111 S.W.3d 699, 703 (Tex. App.CFort Worth 2003,
pet. denied); Tex. Workers= Comp. Ins. Fund
v. Simon, 980 S.W.2d 730, 736 (Tex. App.CSan Antonio 1998,
no pet.); Nat=l Farmers Union Prop. and Cas. Co.
v. Degollado, 844 S.W.2d 892, 897 (Tex. App.CAustin 1993, writ
denied); Tex. Employers= Ins. Assoc. v.
Charles, 381 S.W.2d 664, 668 (Tex. Civ. App.CTexarkana 1964,
writ ref=d n.r.e.). 

Here, the trial court defined Aproducing cause@ as Aan efficient, exciting, or
contributing cause that, in a natural sequence, produces the death in
question.  There may be more than one producing cause.@  We conclude this definition
accurately states the law as applied to Aproducing cause@ in a workers= compensation case and the trial
court did not abuse its discretion when it defined Aproducing cause@ in this manner and rejected
appellant=s proposed definition.[13]  See Tex.
Employers= Ins. Assoc. v. Fuentes, 597 S.W.2d 811, 812 (Tex. Civ. App.CEastland 1980, writ ref=d n.r.e.) (approving identical
language as an accurate definition of Aproducing cause@ in a workers= compensation case).  We overrule
appellant=s second issue.

IV.      The Texas
Constitution Does Not Guarantee a Jury Trial on the Issue of Attorney=s Fees in a
Workers= Compensation Case








The Texas Constitution provides two guarantees of the right
to trial by jury.    Article I, section 15 provides: AThe right to trial
by jury shall remain inviolate.  The Legislature shall pass such laws as may be
needed to regulate the same, and to maintain its purity and efficiency . . . .@  Tex. Const. art.
I, ' 15.  The second
provision is found at article V, section 10 and it provides: AIn the trial of
all causes in the District Courts, the plaintiff or defendant shall, upon
application made in open court, have the right of trial by jury . . . .@  Id. art.
V, ' 10.   In its
fourth issue, appellant contends section 408.221 of the Texas Labor Code
violates its constitutional right to have a jury resolve the contested issue of
appellee=s reasonable and
necessary attorney=s fees.  According to appellant, this
statute violates both article I, section 15 and article V, section 10 of the
Texas Constitution.  We disagree.

A.      The
Standard of Review

When reviewing the constitutionality of a statute, we begin
with the presumption that the statute is constitutional.  Walker v.
Gutierrez, 111 S.W.3d 56, 66 (Tex. 2003); See Tex. Gov=t Code Ann. ' 311.021(1)
(Vernon 2005).  The wisdom or expediency of the law is the legislature=s prerogative, not
ours.  Tex. Workers= Comp. Comm=n v. Garcia, 893 S.W.2d 504,
520 (Tex. 1995).

The party challenging a statute=s
constitutionality has the burden of proving the statute fails to meet
constitutional requirements.  Walker, 111 S.W.3d at 66.  In challenging
the constitutionality of a statute, a party may show a statute is
unconstitutional on its face or as applied to that party.  Garcia, 893
S.W.2d at 518 n.16.  In this appeal, appellant contends section 408.221 of the
Texas Labor Code is unconstitutional on its face; therefore, appellant must
show that the statute, by its terms, always operates unconstitutionally.  Id.
at 518.

B.      Does
Section 408.221 Violate Article I, Section 15 of the Texas Constitution?

At trial, appellee argued, and the trial court accepted,
that section 408.221 of the Texas Labor Code required the trial court to
determine the amount of reasonable and necessary attorney=s fees appellee
was entitled to recover.  Appellant contends on appeal this interpretation of
section 408.221 violates article I, section 15 of the Texas Constitution. 
Section 408.221, provides, in pertinent part:

(b) Except as otherwise provided, an attorney=s fee under this section is based
on the attorney=s time and expenses according to
written evidence presented to the division or court.








(c) An insurance carrier that seeks judicial review . . . of a final
decision of the appeals panel regarding compensability or eligibility for, or
the amount of, . . . death benefits is liable for reasonable and necessary
attorney=s fees . . . incurred by the
claimant as a result of the insurance carrier=s appeal if the claimant prevails on an issue on
which judicial review is sought . . . . If the carrier appeals multiple issues
and the claimant prevails on some, but not all, of the issues appealed, the
court shall apportion and award fees to the claimant=s attorney only for the issues on
which the claimant prevails.  In making that apportionment, the court shall
consider the factors prescribed by Subsection (d).

Tex.
Lab. Code Ann. ' 408.221 (Vernon 2006).

Article I, section 15 provides the right to a jury trial
for those actions or analogous actions which were tried by a jury when the
Texas Constitution was adopted in 1876.  Barshop v. Medina County
Underground Water Conservation Dist., 925 S.W.2d 618, 636 (Tex. 1996). 
Therefore, article I, section 15 only applies if, in 1876, a jury would have
been allowed to try the action or analogous action.  Id.  The Workers= Compensation Act
is a substitute for the common law negligence remedy, which was an action tried
to a jury in 1876.  Tex. Workers= Comp. Comm=n v. Garcia, 893 S.W.2d 504,
527 (Tex. 1995).  Therefore, at least with regard to the recovery of income and
death benefits, the Workers= Compensation Act is analogous to a claim
for which the right to a jury trial is constitutionally preserved.  Id. 
However, the Supreme Court did not address the issue of attorney=s fees in Garcia.

Attorney=s fees are not recoverable in a negligence
suit.  New Amsterdam Cas. Co. v. Tex. Indus., Inc., 414 S.W.2d 914, 915
(Tex. 1967).  Therefore, statutory provisions providing for the recovery of
attorney=s fees in a
negligence or analogous action, are in derogation of the common law.  Id. 
Because there was no common law action to recover attorney=s fees under a
common law negligence claim, we conclude a claim for attorney=s fees brought
pursuant to section 408.221 is not an action or analogous action that was tried
to a jury in 1876.  Accordingly, article I, section 15 does not apply to
appellee=s action to
recover attorney=s fees.








C.      Does
Section 408.221 Violate Article V, Section 10 of the Texas Constitution?

Article V, section 10=s guarantee of a
jury trial does not apply to an appeal from an administrative decision such as
appellant=s.  Garcia, 893 S.W.2d at 527.

Because article I, section 15, and article V, section 10 do
not apply to appellee=s action to recover attorney=s fees pursuant to
section 408.221, the trial court=s denial of
appellant=s request for a jury trial cannot violate those
constitutional provisions.  We overrule appellant=s fourth issue.

V.      Appellee
Did Not Waive Her Claim for Attorney=s Fees

In issue five, appellant contends appellee waived her claim
for attorney=s fees when she failed to submit the issue of her
reasonable and necessary attorney=s fees to the jury
for resolution.  Once again, we disagree.

A.      The Standard
of Review

The availability of attorney=s fees under a
particular statute is a question of law for the court.  Holland v. Wal-Mart
Stores, Inc., 1 S.W.3d 91, 94 (Tex. 1999).  Therefore, we review this issue
de novo.  El Paso Natural Gas Co. v. Minco Oil & Gas, Inc., 8
S.W.3d 309, 312 (Tex. 1999).








We construe statutory provisions to ascertain and
effectuate legislative intent, and we ascertain that intent by first looking to
the plain and common meaning of the statute=s words.  Tex.
Mut. Ins. Co. v. Sonic Sys. Int=l, Inc., 214 S.W.3d 469,
476 (Tex. App.CHouston [14th Dist.] 2006, pet. denied).  We must also
view a statute=s terms in context and give them full effect.  Id. 
When examining the provisions within the Texas Workers= Compensation Act,
we should keep in mind the comprehensive nature of the Act.  Id.  If the
meaning of the statutory language is unambiguous, a court must interpret it
according to its terms consistent with other provisions in the statute.  Tex.
Dep=t of Transp. v. City of Sunset Valley, 146 S.W.3d 637,
642 (Tex. 2004).  A court also considers the objective the law seeks to obtain
and the consequences of a particular construction.  Id.   In our
construction, we must presume the entire statute is intended to be effective, a
just and reasonable result is intended, a result feasible of execution is
intended, and the public interest is favored over private interest.  See Tex.
Gov=t Code Ann. ' 311.021 (Vernon
2005); Compass Bank v. Bent Creek Inv., Inc., 52 S.W.3d 419, 424  (Tex.
App.CFort Worth  2001,
no pet.).  A court reads every word as if it were deliberately chosen and must
presume that omitted words were excluded purposefully.  See Cornyn v.
Universe Life Ins. Co., 988 S.W.2d 376, 379 (Tex. App.CAustin 1999, pet.
denied).   Construction of a statute that would render a provision useless is
not favored  by law.  Carson v. Hudson, 398 S.W.2d 321, 323 (Tex. Civ.
App.CAustin 1966, no
writ).

B.      Because
Section 408.221 States the Trial Court Will Determine the Amount of Attorney=s Fees, Appellee
Did Not Waive Her Claim

By its plain language, section 408.221 provides the amount
of attorney=s fees will be determined by the trial court according
to the written evidence submitted to it.  Tex. Lab. Code Ann. ' 408.221(b).  If
we were to accept appellant=s argument that a workers= compensation
claimant must submit the issue of attorney=s fees sought
pursuant to section 408.221 to the jury, we would render a large portion of the
statute=s language
meaningless.  Therefore, because appellee was not required to submit the issue
of her reasonable and necessary attorney=s fees to the jury
for resolution, she did not waive her claim for attorney=s fees when she
did not do so.  We overrule appellant=s fifth issue.

 

 

 








VI.      Appellant
Waived Its Issue On Appeal Contending It Was Entitled to a Plenary Hearing on
Appellee=s Attorney=s Fees

In its sixth issue, appellant argues appellee waived her
claim for attorney=s fees because she did not present live
testimony at a plenary hearing.  We do not reach the merits of this issue
because appellant waived its claim of waiver.

To preserve error, a timely, specific objection must be
made.  Tex. R. App. P. 33.1(a). 
Rule 33.1(a) requires not only that a party act timely when objecting, but also
state with sufficient specificity the grounds for the objection so the trial
court can act on the objection.  Hoxie Implement Co. v. Baker, 65 S.W.3d
140, 145 (Tex. App.CAmarillo 2001, pet. denied).  In addition,
to preserve error, a party=s argument on appeal must comport with its
argument to the trial court.  Wohlfahrt v. Holloway, 172 S.W.3d 630, 639B40 (Tex. App.CHouston [14th
Dist.] 2005, pet. denied).

In this issue, appellant argues it was entitled to a
plenary hearing where the trial court would hear live testimony on the issue of
attorney=s fees.  See
Jack B. Anglin Co. v. Tipps, 842 S.W.2d 266, 269 (Tex. 1992) (explaining a
plenary hearing is a hearing at which witnesses present sworn testimony in
person or by deposition rather than by affidavit).  However, the only objection
appellant lodged with the trial court on its handling of  appellee=s attorney=s fees was an
objection that it was entitled to a jury trial on that issue.[14] 
This is, of course, a different basis than appellant=s argument on
appeal in this issue.  Accordingly, appellant waived this issue on appeal. 
Tex. R. App. P. 33.1; Wohlfahrt,
172 S.W.3d at 639B40.  We overrule appellant=s sixth issue.

 








VII.     Appellee
Could Recover Attorney=s Fees Incurred
Preparing For and Attending the Hearing on Appellee=s Attorney=s Fees

In issue seven, appellant contends section 408.221 of the
Texas Labor Code does not permit appellee to recover the attorney=s fees incurred in
preparing for and attending the trial court=s hearing on
appellee=s reasonable and
necessary attorney=s fees.  In response, appellee asserts she
is entitled to recovery of those fees and appellant=s argument is
based on a improper rewording of the statute.  We agree with appellee.

A.      The
Standard of Review

Because this issue addresses the availability of attorney=s fees under a
particular statute, the standard of review is the same as that stated in
section V of this opinion.

B.      Under Section
408.221 Appellee is Entitled to Recover Those Attorney=s Fees Incurred as
a Result of Appellant=s Appeal








Section 408.221(c) provides: Aan insurance
carrier that seeks judicial review . . . of a final decision of the appeals
panel regarding compensability or eligibility for, or the amount of, . . .
death benefits is liable for reasonable and necessary attorney fees . . . incurred
by the claimant as a result of the insurance carrier=s appeal if the
claimant prevails on an issue on which judicial review is sought.@  Tex. Lab. Code
Ann. ' 408.221(c). 
Therefore, if the claimant successfully performs the predicateBprevailing on an
issue on which the carrier sought judicial reviewBthe claimant is
entitled to attorney=s fees incurred as a result of the
appeal.  Here, appellee, through her attorneys, was required to prepare and
submit written evidence to the trial court supporting her request for attorney=s fees.  See
Id. ' 408.221(b).  In
addition, because the parties could not agree on the amount of appellee=s reasonable and
necessary attorney=s fees, her attorney was required to set
and attend a trial court hearing on that matter.  We hold appellee incurred
these attorney=s fees as a result of appellant=s appeal.  See
Tex. Mun. League Intergovernmental Risk Pool v. Burns, 209 S.W.3d 806, 819B20 (Tex. App.CFort Worth 2006,
no pet.) (affirming award of post-trial attorney=s fees incurred by
claimant as a result of worker=s compensation insurance carrier=s appeal).

In her brief, appellee candidly brought the Dallas court of
appeals opinion in Twin City Fire Ins. Co. v. Vega-Garcia, 223 S.W.3d
762 (Tex. App.CDallas 2007, pet. denied) to our attention.  In Vega-Garcia,
the Dallas court of appeals determined section 408.221(c) does not permit the
recovery of attorney=s fees incurred in pursuit of attorney=s fees.  Id. at
769B70.  Because the
insurance carrier non-suited its judicial review proceeding, we find Vega-Garcia
distinguishable from this case and, therefore, it does not change our
determination that appellee is entitled to recover those fees incurred as a
result of the hearing on attorney=s fees.  Id.
at 765.  We overrule appellant=s seventh issue.

Conclusion

Having overruled all of appellant=s issues on
appeal, we affirm the trial court=s final judgment.

 

 

 

 

/s/      John S. Anderson

Justice

 

 

Judgment rendered
and Opinion filed August 26, 2008.

Panel consists of
Justices Yates, Anderson, and Brown.

 

 









[1]  A hematoma is a bruise where you have bleeding into
soft tissue.





[2]  Cellutis is a skin inflammatory infectious disease
process.





[3]  Hepatitis C is a viral infection that primarily
affects the liver.  It is a very indolent, chronic infection that can be
quiescent and not cause any clinical problems in some people, but in others it
can be a slowly progressive disorder that leads to scarring of the liver and
cirrhosis.  Hepatitis C can be lethal.





[4]  Hemochromatosis is an iron storage disease in the
liver.





[5]  A potential side effect of amphotericin B is renal
toxicity.





[6]  Cirrhosis of the liver is a process where an agent,
which can be viral in nature, drugs, or autoimmune processes, damages the
liver.  The end result of cirrhosis is a scarring of the normal liver tissue,
which reduces its proper functioning.  Cirrhosis is a process that usually
develops over a long period of time. 





[7]  Propoxyphene is a component of the painkiller
Darvocet, which Mr. Crump was receiving.





[8]  An ileus is a blockage of the intestine.





[9]  The jury question reads:

QUESTION NO. 1

 

You are instructed that the Texas Workers= Compensation Commission found that Charles Crump=s compensable right knee injury of May 9, 2000
resulted in his death on January 23, 2001.

 

AInjury@ means damage
or harm to the physical structure of the body and a disease or infection
naturally resulting from the damage or harm.

 

AProducing Cause@
means an efficient, exciting, or contributing cause that, in a natural
sequence, produces the death in question.  There may be more than one producing
cause.

 

WAS CHARLES CRUMP=S MAY 9, 2000 INJURY A PRODUCING CAUSE OF HIS DEATH?

 

Answer AYes@ or ANo.@

 

Answer:    Yes   





[10]  The six Robinson factors include: (1) the
extent to which the theory has been or can be tested; (2) the extent to which
the technique relies upon the subjective interpretation of the expert; (3)
whether the theory has been subjected to peer review or publication; (4) the technique=s potential rate of error; (5) whether the underlying
theory or technique has been generally accepted as valid by the relevant
scientific community; and (6) the non-judicial uses which have been made of the
theory or technique.  E.
I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 557 (Tex. 1995).  





[11]  Appellant, citing to the Navarro case,
contends Dr. Daller was required to exclude other plausible causes of Mr. Crump=s death with reasonable certainty.  Mo. Pac. R. R. Co. v. Navarro, 90 S.W.3d 747, 750 (Tex. App.CSan Antonio 2002, no pet.).  Once again, we disagree.  Navarro is
distinguishable from this case as it was a toxic tort case dependent upon
epidemiological expert testimony to establish that exposure to diesel exhaust
fumes could cause the plaintiff=s bone marrow
cancer.  Id. at 754.  In addition, in support of its proposition that an
expert must exclude other plausible causes, the Navarro court cited Merrell
Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 720 (Tex. 1997), another toxic
tort case in which the plaintiff had to rely on epidemiological studies to
establish causation.  Finally, in a workers=
compensation case, the law provides there can be more than one producing cause
of the compensable injury or death.  See Flores v. Employees Ret. Sys. of
Tex., 74 S.W.3d 532, 549 (Tex. App.CAustin
2002, pet. denied). 





[12]  Appellant submitted, and the trial court rejected,
the following proposed instruction: A>Producing
cause= means that cause, which in a natural and continuous
sequence, produces death and without which, the death would not have occurred.@





[13]  After the parties submitted their briefs in this
matter, the Texas Supreme Court decided Ford Motor Co. v. Ledesma, 242
S.W.3d 32 (Tex. 2007).  In Ledesma, the Supreme Court determined the
correct definition of Aproducing cause@ in
a products liability action as being a substantial factor in bringing about an
injury, and without which the injury would not have occurred.  Ledesma,
24 S.W.3d at 46.  We find Ledesma distinguishable and inapplicable to
this appeal because it is a products liability case which requires the cause to
be a substantial factor of the event in issue, a requirement absent from a
workers= compensation case.





[14]  In its brief, appellant referenced a single page in
the clerk=s record and a small section of the reporter=s record when addressing preservation of this issue. 
The clerk=s record citation was to an exhibit cover sheet.  The
reporter=s record citation was to a portion of the hearing on
appellee=s motion for new trial following the trial court
granting appellant=s motion for summary judgment based on deemed
admissions.  Neither record citation has any connection with appellant=s plenary hearing issue.